IN THE CIRCUIT COURT OF MILLER COUNTY, ARKANSAS
CIVIL DIVISION

PAUL HARNESS                                                           PLAINTIFF

v.                           46CV-2016- 40-3

LIBERTY MUTUAL FIRE INSURANCE COMPANY                    DEFENDANT

FILED

2016 FEB -9 P 1: 08

MARY PANKEY, CIRCUIT CLERK
BY_____DEPUTY

---

## COMPLAINT

---

COMES now the Plaintiff, Paul Harness, and for his cause of action against the

Defendant, Liberty Mutual Fire Insurance Company ("Liberty Mutual"), states as follows:

### THE PARTIES

1.       By virtue of residing at 2301 Arkansas Boulevard in Texarkana, Arkansas,

Harness was a citizen and resident of Miller County, Arkansas at the time of the motor vehicle

collision hereinafter described.

2.       Liberty Mutual is an insurance company licensed and doing business in Arkansas,

and sold a policy of insurance covering Harness at the time of this motor vehicle collision

hereafter described.

3.       The applicable insurance policy covering Harness at the time of this motor vehicle

collision hereafter described is attached hereto in compliance with Ark. R. Civ. P. 10(d).[1]

4.       The policy number covering Harness at the time of the collision hereinafter

described was AS2-151-289119-038.

5.       The registered agent for Liberty Mutual is the Corporation Service Company

located at 300 Spring Building Suite 900, 300 Spring Street in Little Rock, Arkansas.

---

[1] *See* attached Exhibit A, automobile insurance policy between Liberty Mutual and Harness.

## JURISDICTION AND VENUE

6.     This case arises from a motor vehicle collision that occurred in Little River County, Arkansas, when Mary Kay Harrington (hereinafter referred to as "the underinsured motorist") was negligent in causing the collision hereinafter described.

7.     This Court has jurisdiction over the parties hereto, jurisdiction of the subject matter hereof, and venue is proper.[2]

## THE COLLISION

8.     According to the Arkansas State Police, over 100,000 preventable motor vehicle collisions occur every year.[3]

9.     On June 12, 2009, Paul Harness was travelling south in a white 2007 Ford E350 van on Highway 71 in Ashdown, Arkansas in the scope of his employment with CTM Enterprises, Inc. d/b/a Purafilter 2000 ("Purafilter 2000").

10.     Harness' seat restraint included a lap belt with a shoulder strap.

11.     The underinsured motorist was driving a white 2008 Ford F150, and was traveling north on Highway 71 near Highway 71's intersection with Main Street in Ashdown, Arkansas.

12.     The underinsured motorist failed to yield, ran a stoplight, and attempted to turn left from Highway 71 onto Main Street into the path of Harness' vehicle.

13.     The front of Harness' vehicle struck the right passenger's side of the underinsured motorist's vehicle.

14.     Harness' vehicle was determined to be a total loss.[4]

---

[2] Ark. Code Ann. § 16-60-112(a).

[3] *See* Arkansas Traffic Crash Statistics published by the Arkansas State Police, available at asp.arkansas.gov/services-and-programs/detail/highway-safety-office (last visited February 1, 2016).

[4] *See* attached Exhibit B, photographs of the Harness' vehicle.

2

15.     At all times the Harness vehicle was operated in a safe and prudent manner.

16.     At the time of the collision, Harness' torso was positioned to the right while both hands were on the steering wheel.

17.     After the impact, Harness' shoulders hit the side door; his knees hit the dashboard; and his feet hit the side door.

18.     Harness' seat belt made him more susceptible to injury.

19.     Harness' torso being positioned to the right made him more susceptible to injury.

20.     Following the collision, Harness received reasonable and necessary medical treatment.

21.     The motor vehicle collision was the result of the underinsured motorist's failure to abide by the traffic safety rules listed below:

     A.     Keeping a proper lookout for other vehicles on the roadway;[5]

     B.     Keeping her vehicle under proper control;[6]

     C.     Yielding to any vehicle in the intersection constituting an immediate hazard;[7]

     D.     Yielding the right-of-way to all vehicles approaching from the opposite direction before making a left turn;[8]

     E.     Driving at a reduced speed when special hazard exists with respect to other traffic;[9] and

     F.     Using ordinary care under the circumstances.[10]

---

[5] AMI Civ. 901 (2016).

[6] AMI Civ. 901 (2016).

[7] Ark. Code Ann. § 27-51-503.

[8] Ark. Code Ann. §§ 27-51-502, 27-51-403.

[9] Ark. Code Ann. § 27-51-201(d).

[10] AMI Civ. 305 (2016).

3

22.     Harness reported soreness at the collision scene, but declined to be transported to a hospital by ambulance.

23.     Approximately five hours after the collision, Harness went to the Wake Village Healthcare Express emergency room with radiating and shooting pain on the left side of his body, including his lower back and down his left leg. An x-ray revealed normal alignment, normal bony structures, no soft-tissue swelling, and a non-specific bowl pattern. Harness was diagnosed with a lumbosacral sprain, prescribed medication, and advised to have his condition rechecked in one week or sooner if his symptoms increased.

24.     On June 17, 2009, Harness began treating at the Ark-La-Tex Health Center ("Ark-La-Tex") in Texarkana, Arkansas for continued low back pain caused by the collision. Harness received several different types of treatment modalities from Ark-La-Tex, which helped manage his low back pain, but the treatment never completely relieved all of his symptoms.

25.     Ark-La-Tex ordered an MRI of Harness' lumbar spine on September 24, 2009, which revealed moderate disc narrowing at the L3-4 and L4-5 levels with mild narrowing at the L5-S1 level; minimal posterior disc bulging slightly effacing the thecal sac anteriorly at the L3-4 level with mild hypertrophic degenerative changes within the facets, as well as mild to moderate bilateral neuroforaminal narrowing; moderate to large sized central to left paracentral subligamentous disc extrusion prominently extending into the neural foramen and lateral recess at L4-5 with hypertrophic degenerative changes within the facets, as well as mild to moderate right and severe left neuroforaminal compromise with mild canal stenosis; hypertrophic degenerative changes within the facets with a small broad-based disk bulge/osteophyte complex mainly effacing the epidural fat anteriorly at L5-S1 with bilateral neuroforaminal narrowing without canal stenosis.

4

26.     Harness had a surgical consultation on December 22, 2009 in which a neurosurgeon stated the MRI findings from paragraph 25 "appear[ed] to be relatively recent." As an alternative to surgery, the neurosurgeon recommended Harness receive epidural steroid injections due to Harness experiencing radiculopathy.

27.     Harness continued treating at Ark-La-Tex for his persistent low back pain, and was released at maximum medical improvement on February 1, 2010 with instructions to return on an as needed basis, which Harness did approximately once a month.

28.     On September 10, 2010, Ark-La-Tex referred Harness to Advanced Spine, Sports, and Rehabilitation in Atlanta, Texas to better accommodate Harness' work schedule. The treatment provided by this facility helped Harness, but he still continued to experience symptoms related to the collision caused by the underinsured motorist.

29.     On March 4, 2011, Ark-La-Tex took follow up x-rays of Harness' lumbar spine, which showed four levels were above the established abnormal for spinal instability, which resulted in a 5% whole person impairment rating.

30.     On May 17, 2011, Harness' treating physician at Ark-La-Tex stated Harness improved with conservative treatment, but still experienced pain limiting his activities and affecting his work and home life; that Harness will need to obtain occasional chiropractic care in the future at a cost estimated at $600-$700 per year; and that Harness may require surgical stabilization in his low back at a cost of $100,000 according to 2011 medical sources.

31.     On November 16, 2011, Harness underwent an MRI performed at Premier MRI in Little Rock, Arkansas, which revealed evidence of facet hypertrophy accompanied by developing collisional lesions of the pars interarticularis along the lower lumbar levels with associated discopathy and canal stenosis; hyperlordotic curvature and preferential loss of

5

posterior disc space height results in close approximation of the spinous processes and compression of the interspinous soft tissues with accompanying overlying retrospinal inflammation, the constellation of findings of which are consistent with developing Baastrup phenomenon; accentuated degenerative stress placed on L4-5 as well as the SI joints; at L3-4, degenerative radial expansion of the disc and apposing vertebral endplates, as well as atrophic changes of the erector spinae musculature involving primarily the spinotransversarious, multifidus, and quadratus lumborum groups; at L4-5, decreased intradiscal T2 signal with leftward posterior disc herniation with T2 hyperintensity zone consistent with defect in the underlying annulus fibrosus, as well as extensive fibro-osseous stress reaction of the apposing vertebral endplates, which is a potential pain generator; loss of posterior and leftward disc space height at L4-5 with concomitant rostral caudal subluxation and hypertrophy of the facets that contribute to the degree of leftward central canal and bi-foraminal narrowing; sclerosis of the pars interarticularis bilaterally consistent with developing collisional lesions of the pars interarticulars at L4; partial effacement of the perineural fat planes surrounding the intracanalicular portions of the exiting L4 nerve rootlets; effacement of the perineural fat planes surrounding the extra foraminal portions of the traversing L5 nerve rootlets; atrophic changes of the erector spinae musculature involving primarily the spinotransversarious, multifidus and quadratus lumborum groups; at L5-S1, decreased intradiscal T2 signal without compressive discopathy or central canal stenosis, as well as a loss of disc space height with concomitant rostral caudal subluxation and hypertrophy of the facets that contribute to the degree of central canal and bi-foraminal narrowing; sclerosis of the pars interarticularis bilaterally consistent with developing collisional lesions of the pars interarticulars at L5; effacement of the perineural fat planes surrounding the intracanalicular portions of the exiting L5 nerve rootlets; effacement of

6

the perineural fat planes surrounding the extra foraminal portions of the traversing S1 nerve rootlets; at L5-S1, atrophic changes of the erector spinae musculature involving primarily the spinotransversarious, multifidus and quadratus lumborum groups; and at the SI joints, symmetric hypertrophy of the sacroiliac joints with accompanying fibro-osseous stress reaction within the sacrum bilaterally.

32.     Ark-La-Tex performed follow up x-rays on Mr. Harness on March 4, 2014, which revealed spondylolisthesis at L4-5 and L5-S1; and translational motion segment integrity changes at L4-5 equaling 4.63 mm and at L5-S1 equaling 5.42 mm. As a result of these measurements, Harness was diagnosed with a 23% whole person impairment rating according to the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (5th ed. AMA Press 2001).

33.     On March 27, 2014, Harness underwent a nerve conduction study based on the x-ray findings in paragraph 32. The results of the nerve conduction study included no response of the right ulnar sensory nerve as well as low amplitude in both median motor nerves, which suggested neuropathy in both median nerves to the interpreting radiologist.

34.     As a result of his physical limitations, Harness resigned from Purafilter 2000 in September of 2012. His job required him to drive 1,200 miles each week around the Texarkana region. After the collision, he took a break from sitting every two hours, which totaled 6-8 breaks per day. His workdays were longer because of his deteriorated ability to get in and out of his work truck. Before the collision, Harness was able to accomplish work tasks easily, quickly, and efficiently.

35.     Since resigning from Purafilter 2000 in September of 2012, Harness has worked at the Red River Army Depot; the Texarkana Gazette; Professional Transportation Inc., and at two hotels in Texarkana, Texas.

36.     Harness has not earned the same amount of money since resigning from Purafilter 2000, has occasionally been forced by economic necessity to assume duties beyond his physical capacity.[11]

37.     For example, Harness began working at the Red River Army Depot on June 27, 2013. Before he began his employment, Harness underwent a physical examination whereby he told the examiner he had back pain. The examiner wrote Harness could lift up to 75 pounds.

38.     On November 25, 2013, Harness' treating physician at Ark-La-Tex sent Harness' supervisor at the Red River Army Depot an authorization to be absent from work due to medical reasons from November 8, 2013 to November 21, 2013.

39.     On January 29, 2014, Harness was "proposed to be separated" from his position at the Red River Army Depot due to the authorization sent by Harness' treating physician at Ark-La-Tex. As a result, Harness had to seek employment elsewhere.

40.     Harness managed and continues to manage his low back pain by performing home therapies including but not limited to purchasing an Invertabod traction table for home use, taking prescription and over the counter pain medication, and managing his physical limitations by restricting his activities.

_____

[11] *See* Henry Woods, *Earnings and Earning Capacity as Elements of Danger in Personal Injury Litigation*, 18 Ark. L. Rev. 304, 314 (1964).

8

41.     Harness must alternate sitting, standing, walking, and lying down to manage his chronic pain syndrome; must avoid strenuous physical activities; carefully watch what he lifts; and take stretch breaks when traveling by motor vehicle.

42.     Harness used to be an active person and get plenty of exercise, such as playing basketball and working out.

43.     Harness' day-to-day physical activities have also been affected such as the physical ability to walk in a mall, go to church, attend social functions, play cards, perform household chores, play with his dogs, swimming, fishing, cooking at family gatherings, gardening, traveling for long periods of time, helping others with physical limitations, and playing with young relatives, including but not limited to his four-year old daughter.

44.     Before the collision, Harness would cook for his wife before she came home from work. After the wreck, he may cook once a week. Because he cannot stand for long periods of time, Harness' ability to cook has been significantly Admitaltered. Harness was also able to wash dishes, do laundry, take trash out, and other household chores before the collision. Since the collision, Harness' wife and sister-in law must pick up the slack in performing the above-described household chores.

45.     Before the collision, Harness would help his mother-in law around her home by cutting her yard, cleaning her house, maintaining her vehicle, and other home repair-type chores. Harness' sister-in law now performs the chores Harness would have otherwise performed at his home, as well as his mother-in law's home, in addition to keeping Harness' daughter during the day. Harness pays his sister-in law $300 per month for these services, and will continue to do so in the future as a result of his injuries caused by the underinsured motorist.

9

46.     As a result of the collision, Harness has been unable to live his life without added inconvenience or diminution of physical vigor.

## CAUSATION OF HARNESS' INJURIES AND DAMAGES

47.     The allegations in the preceding paragraphs are incorporated by reference.

48.     The injuries and damages sustained by Harness, more particularly described below, were produced in a natural and continuous sequence from the underinsured motorist's violation of one or more of the above described independent duties of ordinary care for the safety of Harness.[12]

49.     The injuries and damages sustained by Harness were a probable consequence from the underinsured motorist's violation of one or more of the above described independent duties of ordinary care for the safety of Harness.[13]

50.     The underinsured motorist should have foreseen and anticipated that a violation of one or more of the above described independent duties to use ordinary care would constitute an appreciable risk of harm to others, including Harness.[14]

51.     If the underinsured motorist had not violated one or more of the above described independent duties to use ordinary care for the safety of Harness, then the injuries and damages sustained by Harness would not have occurred.[15]

## COMPENSATORY DAMAGES SUSTAINED BY HARNESS

52.     The allegations in the preceding paragraphs are incorporated by reference.

---

[12] AMI Civ. 501 (2016).

[13] *Ouachita Wilderness Inst. v. Mergen*, 329 Ark. 405, 415, 947 S.W.2d 780, 785 (1997).

[14] *State Farm Mut. Auto. Ins. Co. v. Pharr*, 305 Ark. 459, 464, 808 S.W.2d 769, 771-72 (1991) (following *Machine, Inc. v. Wallace*, 268 Ark. 192, 600 S.W.2d 1 (1980)).

[15] AMI Civ. 501 (2016).

10

53.     The injuries and damages sustained by Harness as a result of the underinsured motorist's violations of one or more of the above traffic safety rules, include but are not limited to the following:

A.     Serious and permanent bodily injuries to parts of Harness' body related to his spine, which is a life-altering event causing Harness to lose the ability to enjoy a normal quality of life, and depriving him of the right to live his life in comfort and ease without added inconvenience or diminution of physical vigor;[16]

B.     Aggravation of a condition(s) already then existing at the time of the collision that predisposed Harness to injury to a greater extent than another person;[17]

C.     Medical expenses incurred in the past and reasonably expected to be incurred in the future, and transportation expenses to obtain such medical treatment;[18]

D.     Physical pain and suffering experienced in the past and reasonably expected to be experienced in the future;[19]

E.     Loss of earning capacity due to permanent physical impairment from the injuries caused by the collision;[20]

---

[16] AMI Civ. 2202 (2016); *Sanson v. Allinson*, 2014 Ark. App. 619, 447 S.W.3d 151; *Gross & Janes Co. v. Brooks*, 2012 Ark. App. 702, 425 S.W.3d 795; *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 268 S.W.3d 905 (2007); *Fayetteville Diagnostic Clinic v. Turner*, 344 Ark. 490, 42 S.W.3d 420 (2001); *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *Wheeler v. Bennett*, 312 Ark. 411, 849 S.W.2d 952 (1993); *Adkins v. Kelley*, 244 Ark. 199, 424 S.W.2d 373 (1968) (quoting Henry Woods, *Earnings and Earning Capacity as Elements of Danger in Personal Injury Litigation*, 18 Ark. L. Rev. 304, 305 (1964)).

[17] AMI Civ. 2203 (2016); *Sanson v. Allinson*, 2014 Ark. App. 619, 447 S.W.3d 151; *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *Primm v. U.S. Fid. & Guar. Ins. Corp.*, 324 Ark. 409, 922 S.W.2d 319 (1996); *Owen v. Dix*, 210 Ark. 562, 196 S.W. 319 (1946); *see also Kudabeck v. Kroger Co.*, 338 F.3d 856 (8th Cir. 2003); *Tedder v. Am. Railcar Indus.*, 739 F.3d 1104 (8th Cir. 2014).

[18] AMI Civ. 2204 (2016); *Gross & Janes Co. v. Brooks*, 2012 Ark. App. 702, 425 S.W.3d 795; *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 268 S.W.3d 905 (2007); *Fayetteville Diagnostic Clinic v. Turner*, 344 Ark. 490, 42 S.W.3d 420 (2001); *Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991); *Honeycutt v. Walden*, 294 Ark. 440, 743 S.W.2d 809 (1988); *Matthews v. Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983); *Williams v. Gates*, 275 Ark. 381, 630 S.W.3d 34 (1982); *Haney v. Noble*, 250 Ark. 557, 466 S.W.2d 467 (1971) (citing *Belford v. Humphrey*, 244 Ark. 211, 424 S.W.2d 526 (1968)).

[19] AMI Civ. 2205 (2016); *Fayetteville Diagnostic Clinic v. Turner*, 344 Ark. 490, 42 S.W.3d 420 (2001); *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *RLI Ins. Co. v. Coe*, 306 Ark. 337, 813 S.W.2d 783 (1991); *Bill Davis Trucking, Inc. v. Prysock*, 301 Ark. 387, 784 S.W.2d 755 (1990); *Handy Dan Home Improv. Center, Inc. v. Peters*, 286 Ark. 102, 689 S.W.2d 551 (1985).

11

F.    Mental anguish experienced in the past and reasonably expected to be experienced in the future, which includes but is not limited to Harness' loss of quality of life due to permanent injuries causing chronic pain that limits his activities;[21] and

G.    The reasonable expense of any necessary help in Harness' home in the past, and reasonably certain to be required in the future, as a result of Harness' injuries.[22]

## HARNESS' UNDERINSURED MOTORIST CLAIM WITH LIBERTY MUTUAL

54.    The allegations in the preceding paragraphs are incorporated by reference.

55.    On August 8, 2011, the liability insurance carrier for the underinsured motorist offered to settle Harness' primary claim for $25,000, which was the underinsured motorist's liability policy limits.

56.    On September 26, 2011, Harness provided Liberty Mutual with written notice of the tentative settlement between Harness and the underinsured motorist.

57.    On November 30, 2011, Liberty Mutual waived their subrogation rights in the tentative settlement proceeds between Harness and the underinsured motorist.

---

[20] AMI Civ. 2207 (2016); *Sanson v. Allinson*, 2014 Ark. App. 619, 7, 447 S.W.3d 151; *Gross & Janes Co. v. Brooks*, 2012 Ark. App. 702, 425 S.W.3d 795; *Grafienreed v. Seabaugh*, 100 Ark. App. 364, 268 S.W.3d 905 (2007); *Collins v. Hinton*, 327 Ark. 159, 937 S.W.2d 164 (1997); *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *Gipson v. Garrison*, 308 Ark. 344, 824 S.W.2d 829 (1992); *Bill Davis Trucking, Inc. v. Prysock*, 301 Ark. 387, 784 S.W.2d 755 (1990); *West Union v. Vostatek*, 302 Ark. 219, 788 S.W.2d 952 (1990); *Honeycutt v. Walden*, 294 Ark. 440, 743 S.W.2d 809 (1988); *Haney v. Noble*, 250 Ark. 557, 466 S.W.2d 467 (1971); *Blissett v. Frisby*, 249 Ark. 235, 458 S.W.2d 735 (1970); *Hogan v. Hill*, 229 Ark. 758, 318 S.W.2d 580 (1958); *Britt Trucking Co. v. Ringgold*, 209 Ark. 769, 192 S.W.2d 532 (1946).

[21] AMI Civ. 2205 (2016); *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *RLI Ins. Co. v. Coe*, 306 Ark. 337, 813 S.W.2d 783 (1991); *Chicago, R.I. & P. Ry. Co. v. Caple*, 207 Ark. 52, 179 S.W.2d 151 (1944); *Scott-Burr Stores Corp. v. Foster*, 197 Ark. 232, 122 S.W.2d 165 (1938); Howard W. Brill, *Law of Damages* § 29 (5th ed. Thompson West 2004).

[22] AMI Civ. 2209 (2016); *Gross & Janes Co. v. Brooks*, 2012 Ark. App. 702, 425 S.W.3d 795; *Carr v. Nance*, 2010 Ark. 497, 370 S.W.3d 826; *Jackson v. United States*, 526 F. Supp. 1149 (E.D. Ark. 1981), *aff'd*, 696 F.2d 999 (8th Cir. 1982); *Perkins Oil Co. of Del. v. Fitzgerald*, 197 Ark. 14, 121 S.W.2d 877 (1938).

58.     On December 14, 2011, Harness made a demand in the amount of Liberty Mutual's $1,000,000 policy limit.

## DUTIES OWED BY LIBERTY MUTUAL

59.     The allegations in the preceding paragraphs are incorporated by reference.

60.     The underinsured motorist coverage provided by Liberty Mutual states "[Liberty Mutual] will pay all sums [Harness] is legally entitled to recover as compensatory damages from the owner or driver of an underinsured motor vehicle."[23]

61.     The compensatory damages Harness is legally entitled to recover from the underinsured motorist are provided in paragraph 53(A-G) above.

62.     The compensatory damages provided in paragraph 53(A-G) above is the applicable law as it relates to the underinsured motorist insurance policy issued by Liberty Mutual referred to in paragraph 60 above.

63.     Liberty Mutual owed a duty to evaluate Harness' claim in good faith and deal fairly with Harness in performing Liberty Mutual's obligations under the insurance policy.[24]

64.     Liberty Mutual owed a duty to provide Harness with a reasonable explanation of the basis in the insurance policy in relation to the facts and applicable law for Liberty Mutual's settlement offers.

65.     Liberty Mutual owed a duty to consider all of the documentation and evidence supporting Harness' UIM claim.

---

[23] *See* attached Exhibit A, automobile insurance policy between Liberty Mutual and Harness.

[24] AMI Civ. 2426 (2016); *see also Ark. Research Med. Testing v. Osborne*, 2011 Ark. 158 at 9 ("a breach of the implied covenant of good faith and fair dealing [is] … evidence of a … breach of contract between the parties.")

13

66.     Liberty Mutual, in determining whether to accept or reject an offer of compromise, owed a duty to give Harness at least equal consideration to Harness' interests as Liberty Mutual gave to its own interests.[25]

67.     Liberty Mutual owed a duty to treat Harness consistently with the requirements of the laws and regulations promulgated by the Arkansas Insurance Department, and codified by the Trade Practices Act.[26]

68.     Liberty Mutual owed a duty to conduct a full, fair, prompt, and objective investigation of Harness' UIM claim at Liberty Mutual's own expense.

69.     Liberty Mutual owed a duty to fully, fairly, and promptly evaluate Harness' UIM claim.

70.     Liberty Mutual owed a duty to avoid denying or underpaying any part of Harness' UIM claim based upon insufficient information, speculation, or biased information.

71.     Liberty Mutual owed a duty to avoid denying or underpaying any part of Harness' UIM claim based upon speculation or insufficient, biased, faulty, invalid, or unreliable information.

72.     Liberty Mutual owed a duty to provide Harness with a written explanation pointing to facts and policy provisions supporting partial denial of his claim.

73.     Liberty Mutual owed a duty to Harness to avoid making unreasonably low settlement offers.

74.     Liberty Mutual owed a duty to objectively evaluate Harness' UIM claim based on all available evidence, and not just the evidence Liberty Mutual believes to support its position.

---

[25] *S. Farm Bureau Cas. Ins. Co. v. Parker*, 232 Ark. 841, 848-849, 341 S.W.2d 36, 41 (1960).

[26] *See* Ark. Code Ann. § 23-66-101 *et seq.*

14

75.     Liberty Mutual owed a duty to consider only factors in its evaluation of Harness' UIM claim for which there was evidence.

76.     Liberty Mutual owes a duty to Harness to select or use unbiased consultants or experts.

77.     Liberty Mutual owed a duty under Arkansas law to avoid preventing, hindering, or delaying the performance of its obligations owed to Harness and other policyholders.[27]

78.     Liberty Mutual owed a duty to treat Harness' UIM claim as a non-adversarial process.

79.     Liberty Mutual owed a duty to Harness to educate its auto claims adjusters about the nature, extent, and permanency of injuries capable of being caused by motor vehicle collisions.

80.     Liberty Mutual owed a duty to Harness to ensure its auto claims adjusters have current knowledge about medical and scientific research regarding the diagnosis and treatment of motor vehicle collision injuries.

81.     Liberty Mutual owed a duty to Harness to use scientific research in an intellectually honest manner in evaluating injury claims.

82.     Liberty Mutual owed a duty to Harness to avoid misrepresenting facts or policy provisions.

83.     Liberty Mutual owed a duty to Harness to avoid attacking the character, reputation, and credibility of a person making a claim.

84.     Liberty Mutual owed a duty to Harness to avoid attacking the character, reputation, and credibility of a physician treating a person making a claim.

---

[27] AMI Civ. 2426 (2016).

15

85.     Liberty Mutual owed a duty to Harness to avoid discriminating against chiropractic treatment versus other types of treatment.

86.     Liberty Mutual owed a duty to Harness to explain how it interprets its policy and how it handles similarly situated claims.

87.     Liberty Mutual owed a duty to Harness to adhere to Arkansas law for claims arising in Arkansas.

88.     Liberty Mutual owed a duty to Harness to avoid unfair claims settlement practices as defined in the Trade Practices Act.[28]

89.     Liberty Mutual owed a duty to Harness to adhere to the rules and regulations of the Arkansas Insurance Department.

90.     Liberty Mutual owed a duty to Harness to settle his UIM claim without influencing settlements under other portions of the insurance policy coverage.

91.     Liberty Mutual must give the benefit of the doubt to its insured when making claims decisions.

92.     Liberty Mutual owes a duty to Harness to reevaluate claims as new information is developed, including but not limited to discovery responses after lawsuits are filed.

93.     Failure to discharge these duties and obligations constitutes evidence Liberty Mutual prevented, hindered, or delayed performance of its obligations owed under the insurance policy.

94.     In this case, Liberty Mutual failed to discharge these duties and obligations owed to Harness.

---

[28] Ark. Code Ann. § 23-66-206(13).

16

95.     There is no good faith defense to Liberty Mutual's actions, and these actions were not the result of an honest error in judgment.

**INFORMATION LIKELY TO BE IN THE POSSESSION OF LIBERTY MUTUAL**

96.     The allegations in the preceding paragraphs are hereby incorporated by reference.

97.     Most of the proof of Harness' claims will be uniquely and solely in the possession of Liberty Mutual.

98.     Because the facts of this case are peculiarly within the opposing parties knowledge, Harness pleads these allegations generally as to the malice, intent, knowledge, and state of mind of Liberty Mutual.[29]

99.     Such allegations have evidentiary support arising out of the facts of this case, and Harness believes such allegations will have further evidentiary support after a reasonable opportunity for further investigation and discovery from Liberty Mutual.[30]

**COUNT I - BREACH OF CONTRACT**

100.     The allegations in the preceding paragraphs are incorporated by reference.

101.     On August 8, 2009, Liberty Mutual began paying Harness worker's compensation benefits. Liberty Mutual last paid worker's compensation benefits to Harness on August 31, 2010. The total amount of worker's compensation benefits paid to Harness was $2,629.97.

102.     Paragraphs 55-58 are incorporated into this paragraph by reference.

103.     On January 20, 2012, Liberty Mutual requested more documentation, which Harness provided on March 7, 2012.

---

[29] Ark. R. Civ. P. 9(b).

[30] *Parker v. S. Farm Bureau Cas. Ins. Co.*, 326 Ark. 1073, 935 S.W.2d 556 (1996); *Marrow v. State Farm Ins. Co.*, 264 Ark. 227, 570 S.W.2d 607 (1978).

17

104.    On April 18, 2012, Harness accepted a $20,000 offer under his underinsured motorist coverage from his personal automobile insurance company.

105.    On June 1, 2012, Liberty Mutual offered $15,000 to settle Harness' UIM claim.

106.    On May 23, 2012, Liberty Mutual indicated by email any settlement agreement of Harness' UIM claim would be contingent upon Harness satisfying a worker's compensation lien.[31]

107.    On December 13, 2012, Harness requested Liberty Mutual provide the basis of their offer. Liberty Mutual responded by stating they considered "the alleged" permanency of the condition and the disability rating provided. Liberty Mutual also stated they factored in the degenerative changes seen at L3-4, L4-5, and L5-S1 on Harness' MRI of September 24, 2009.

108.    On February 25, 2014, Harness provided Liberty Mutual with additional documentation indicating trauma accelerates the rate of degeneration in the spine, as well as documentation regarding risk factors associated with frontal impact collisions. Harness again requested the basis of Liberty Mutual's offer by specifically asking whether Liberty Mutual considered Harness' need for future medical expenses, and whether Liberty Mutual considered **all** of the MRI findings on the MRIs dated September 24, 2009 and November 16, 2011. Harness also requested Liberty Mutual evaluate whether Harness would have had the degenerative changes seen on these MRIs if the collision had never occurred.

109.    On February 26, 2014, Liberty Mutual increased their offer to $22,500, and explained they considered the medical expenses and medical records provided, the effect of the injury on Mr. Harness, and the amounts paid by State Farm.

---

[31] *See* attached Exhibit C, email from Liberty Mutual adjuster failing to promptly settle Harness' UIM claim in an attempt to influence settlements under other portions of Liberty Mutual's insurance policy.

18

110.    On September 3, 2014, Liberty Mutual advised they had changed claims adjusters and contacted Harness to discuss his UIM claim.

111.    On September 9, 2014, Harness advised Liberty Mutual he was gathering supplemental information for their review.

112.    On June 8, 2015, Harness lowered his demand to $725,000, and provided Liberty Mutual with additional documentation supporting Harness' UIM claim. This additional documentation is described in paragraphs 30-45 above. Harness also provided Liberty Mutual with an employment authorization in order for Liberty Mutual to fully and fairly investigate Harness' employment history.

113.    On July 31, 2015, Harness sent a follow up letter to Liberty Mutual requesting they respond to Harness' correspondence of June 8, 2015.

114.    Liberty Mutual never evaluated the documentation and other information contained within Harness' correspondence of June 8, 2015.

115.    The total amount of Harness' recovery from the wreck with the underinsured motorist was $47,629.97, which includes the sums paid by the underinsured motorist's primary liability coverage, worker's compensation benefits from Liberty Mutual, and underinsured motorist coverage from Harness' personal automobile insurance company.

116.    On information and belief, Purafilter 2000 fired Liberty Mutual from providing insurance coverage because Liberty Mutual refused to fairly pay the claims of Purafilter 2000's employees.

117.    On information and belief, Liberty Mutual engaged in the same or similar pattern and practice in handling the claims of other employees of Purafilter 2000 as alleged herein for Harness' UIM claim.

19

118.    Liberty Mutual violated the duty to evaluate Harness' claim in good faith and deal fairly with Harness in performing Liberty Mutual's obligations under the insurance policy.[32]

119.    Liberty Mutual violated the duty to provide Harness with a reasonable explanation of the basis in the insurance policy in relation to the facts and applicable law for Liberty Mutual's settlement offers.

120.    Liberty Mutual violated the duty to consider all of the documentation and evidence supporting Harness' UIM claim.

121.    Liberty Mutual, in determining whether to accept or reject an offer of compromise, violated the duty to give Harness at least equal consideration to Harness' interests as Liberty Mutual gave to its own interests.[33]

122.    Liberty Mutual violated the duty to treat Harness consistently with the requirements of the laws and regulations promulgated by the Arkansas Insurance Department, and codified by the Trade Practices Act.[34]

123.    Liberty Mutual violated the duty to conduct a full, fair, prompt, and objective investigation of Harness' UIM claim at Liberty Mutual's own expense.

124.    Liberty Mutual violated the duty to fully, fairly, and promptly evaluate Harness' UIM claim.

125.    Liberty Mutual violated the duty to avoid denying or underpaying any part of Harness' UIM claim based upon insufficient information, speculation, or biased information.

---

[32] AMI Civ. 2426 (2016); *see also Ark. Research Med. Testing v. Osborne*, 2011 Ark. 158 at 9 ("a breach of the implied covenant of good faith and fair dealing [is] … evidence of a … breach of contract between the parties.")

[33] *S. Farm Bureau Cas. Ins. Co. v. Parker*, 232 Ark. 841, 848-849, 341 S.W.2d 36, 41 (1960).

[34] *See* Ark. Code Ann. § 23-66-101 *et seq.*

20

126.    Liberty Mutual violated the duty to avoid denying or underpaying any part of Harness' UIM claim based upon speculation or insufficient, biased, faulty, invalid, or unreliable information.

127.    Liberty Mutual violated the duty to provide Harness with a written explanation pointing to facts and policy provisions supporting partial denial of his claim.

128.    Liberty Mutual violated the duty to Harness to avoid making unreasonably low settlement offers.

129.    Liberty Mutual violated the duty to objectively evaluate Harness' UIM claim based on all available evidence, and not just the evidence Liberty Mutual believes to support its position.

130.    Liberty Mutual violated the duty to consider only factors in its evaluation of Harness' UIM claim for which there is evidence.

131.    Liberty Mutual violated the duty to avoid preventing, hindering, or delaying the performance of its obligations owed to Harness.[35]

132.    Liberty Mutual violated the duty to treat claims as a non-adversarial process.

133.    Liberty Mutual violated the duty to use scientific research in an intellectually honest manner in evaluating injury claims.

134.    Liberty Mutual violated the duty to avoid misrepresenting facts in evaluating claims.

135.    Liberty Mutual violated the duty to adhere to Arkansas law for claims arising in Arkansas.

---

[35] AMI Civ. 2426 (2016).

21

136.    Liberty Mutual violated the duty to avoid unfair claims settlement practices as defined in the Trade Practices Act.[36]

137.    Liberty Mutual violated the duty to adhere to the rules and regulations of the Arkansas Insurance Department.

138.    Liberty Mutual violated the duty to settle Harness' UIM claim without influencing settlements under other portions of the insurance policy coverage.

139.    Liberty Mutual violated the duty to give the benefit of the doubt to Harness when making claims decisions.

140.    Liberty Mutual violated the duty to reevaluate Harness' claim as new information developed.

141.    Liberty Mutual had duty to pay Harness' UIM policy benefits consistent with Harness' damages as alleged above.

142.    Despite demand, Liberty Mutual failed and refused to pay Harness' demand, and violated its contractual duties inherent in the policy of insurance with Harness by not paying the UIM insurance benefits to which Harness is entitled.

## COUNT II – DECEPTIVE TRADE PRACTICES

143.    The allegations contained in the preceding paragraphs are incorporated by reference.

144.    This count is for actual damages, punitive damages, and attorneys' fees for the deceptive trade practices committed by Liberty Mutual in violation of the Arkansas Deceptive Trade Practices Act ("ADTPA").[37]

---

[36] Ark. Code Ann. § 23-66-206(13).
[37] Ark. Code Ann. §§ 4-88-113(f).

22

145.   "The Arkansas Deceptive Trade Practices Act ... makes illegal any trade practice which is unconscionable, which includes conduct violative of public policy or statute."[38]

146.   Arkansas law prohibits Liberty Mutual from engaging in any "unconscionable" or "deceptive acts or practices" in the business of insurance.[39]

147.   As set forth above, Liberty Mutual engaged in any or all of the following as a routine business practice, any one of which is defined under Arkansas law as an unfair or deceptive trade practice:

A.   Failing to acknowledge and act reasonably and promptly upon communications with respect to claims arising under insurance policies;[40]

B.   Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;[41]

C.   Refusing to pay claims without conducting a reasonable investigation based upon all available information;[42]

D.   Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;[43]

E.   Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts and applicable law for denial of a claim or for the offer of a compromise settlement;[44]

F.   Compelling insureds to institute litigation to recover losses due under the insurance policy by offering substantially

---

[38] *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006).

[39] Ark. Code Ann. § 23-66-206(13); Ark. Code Ann. § 4-88-107(a)(10).

[40] Ark. Code Ann. § 23-66-206(13)(B).

[41] Ark. Code Ann. § 23-66-206(13)(C).

[42] Ark. Code Ann. § 23-66-206(13)(D).

[43] Ark. Code Ann. § 23-66-206(13)(F).

[44] Ark. Code Ann. § 23-66-206(13)(J).

23

less than the amount an insured ultimately recovers in the action;[45]

G.  Failing to promptly settle claims, when liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;[46]

H.  Violating the law, regulations, and policy of the state of Arkansas;[47] and

I.  Participating in, assisting, facilitating, aiding and abetting, and/or knowingly benefitting from any or all of the foregoing conduct.

148.  Liberty Mutual has engaged in deceptive and unfair acts in violation of Arkansas law as indicated above.

149.  Harness sustained actual damages and injuries as a result of Liberty Mutual's violations of the ADTPA, in an amount to be determined at trial, in excess of the amount required for federal court jurisdiction in diversity of citizenship cases.

150.  Harness is aware the Arkansas Supreme Court recently held a non-profit corporation and a bank were exempt from a ADPTA claim by a design company because the non-profit corporation and bank were regulated by a regulatory body acting under statutory authority of Arkansas or of the United States; and because no evidence was presented of a specific request made to the Attorney General of whether the conduct of the non-profit corporation and bank were subject to the ADPTA.[48]

---

[45] Ark. Code Ann. § 23-66-206(13)(K).

[46] Ark. Code Ann. §23-66-206(13)(N).

[47] Ark. Code Ann. § 23-89-201 *et. seq.*; *Riley v. State Farm Mut. Auto. Ins. Co.*, 2011 Ark. 256, 381 S.W.3d 840 (2011).

[48] *Arloe Designs, LLC v. Ark. Capital Corp.*, 2014 Ark. 21, 6, 431 S.W.3d 277, 281-82 (2014).

24

151.    The alleged conduct of the non-profit corporation and bank did not give rise to liability to the design company, and thus the non-profit corporation and bank were implicitly engaging in conduct permitted that was sufficient to trigger the safe harbor provisions of the ADPTA.

152.    The Arkansas Supreme Court has previously indicated a regulated-actor must be engaged in permitted conduct in order for the safe harbor provisions of the ADTPA to take effect.[49]

153.    The Arkansas Supreme Court has previously held the ADTPA is not limited to actions brought only by the Arkansas Attorney General.[50]

154.    Requiring the approval of the Arkansas Attorney General before a person makes a ADPTA claim violates the plain language of Ark. Code Ann. § 4-88-113(f), which states "any person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees."

155.    Harness is aware the U.S. District Court for the Eastern District of Arkansas has held in prior cases that insurers are exempt from ADTPA claims by virtue of Ark. Code Ann. § 4-88-101(3).[51]

156.    Harness pleads this cause of action with the good-faith belief the Arkansas Supreme Court has never ruled that insurers enjoy a universal exemption from ADTPA claims under Ark. Code Ann. § 4-88-101(3).[52]

---

[49] *Mercury Mktg. Techs. of Del., Inc. v. State ex rel. Beebe*, 358 Ark. 319, 327, 189 S.W.3d 414, 419 (2004).

[50] *Anderson v. Stewart*, 366 Ark. 203, 206, 234 S.W.3d 295, 297 (2006).

[51] *Williams v. State Farm Mut. Auto. Ins. Co.*, 2010 U.S. Dist. LEXIS 61613 (E.D. Ark. June 22, 2010) *but see Ables v. Monumental Life Ins. Co.*, 2012 U.S. Dist. LEXIS 18519 (E.D. Ark. February 15, 2012) (finding the plaintiff provided sufficient factual information to provide the grounds for a ADTPA claim against an insurance company).

157.    Other jurisdictions have addressed virtually identical exemptions as the one found at Ark. Code Ann. § 4-88-101(3), and have applied two (2) tests, as follows:

A.    The "specific conduct" rule, which looks to whether the conduct at issue is either permitted or prohibited by state law, and only exempts permitted conduct from deceptive trade practice claims;[53] and

B.    The "general activity" rule, which looks to whether the conduct is subject to regulation by a state agency, in which case the regulated conduct is wholly exempt from deceptive trade practice claims.[54]

158.    An Arkansas Attorney General's opinion indicates that if a bank's "use of a different name on a bank branch location is permissible or not prohibited under applicable banking laws or regulations, it is not subject to action under the ADTPA."[55]

159.    The conclusion to this Attorney General's opinion implies the corollary is also true:    if conduct is prohibited under applicable insurance laws or regulations, then it is subject to action under the ADPTA.

160.    Specifically prohibited conduct cannot meet a statutory definition of permitted conduct without an absurd result occurring.

161.    The Arkansas Supreme Court has implicitly approved of the "specific conduct" rule by requiring a factual determination under substantive law in holding a pharmaceutical

---

[52] Nathan Price Chaney, *The Arkansas Deceptive Trade Practices Act: the Arkansas Supreme Court should adopt the specific-conduct rule*, 67 Ark. L. Rev. 299 (2014).

[53] *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47 (Colo. 2001); *Ward v. Dick Dyer Assoc., Inc.*, 304 S.C. 152, 403 S.E.2d 310 (1991); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819 (Ky. 1988); *Willsey v. Shelter Mut. Ins. Co.*, 2013 U.S. Dist. LEXIS 116256 (August 16, 2013).

[54] *Ferguson v. United Ins. Co. of Am.*, 293 S.E.2d 736 (Ga. Ct. App. 1982); *State v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978); *Williams v. State Farm Mut. Auto. Ins. Co.*, 2010 U.S. Dist. LEXIS 61613 (June 22, 2010).

[55] Op. Ark. Att'y Gen. No. 337 (1996).

26

company's drug advertisements fell within the safe harbor provision of the ADPTA because the advertisements constituted actions permitted by the Food and Drug Administration.[56]

162.    Of the states to consider statutory language identical or substantially similar to Ark. Code Ann. § 4-88-101(3), the overwhelming majority of states have adopted the "specific conduct" rule, which permits deceptive trade practice claims against insurers if the insurer's conduct is not expressly permitted, authorized, or required by state law.[57]

163.    Arkansas' consumers of insurance, including Harness and other Liberty Mutual policyholders, are constitutionally guaranteed to a remedy in the laws for all injuries and wrongs sustained by specific instances of regulated-actor wrongdoing.[58]

164.    A private right of action accomplishes this constitutional guarantee for Arkansas' consumers of insurance, including Harness and other Liberty Mutual policyholders, to have a remedy to address specific instances of regulated-actor wrongdoing.

165.    Harness respectfully submits this Court should explicitly adopt the "specific conduct" rule in accordance with the Ark. Const. Art. 2, § 13 because the "general activity" rule would otherwise deprive Harness and other Liberty Mutual policyholders of a remedy for specific instances of regulated-actor wrongdoing.

## AMOUNT OF DAMAGES

166.    As a result of Liberty Mutual's violating the insurance contract, Liberty Mutual is liable to Harness in an amount that exceeds the amount required for federal court jurisdiction in

---

[56] *DePriest v. AstraZeneca Pharms., L.P.*, 2009 Ark. 547, 351 S.W.3d 168 (2009); *see also Anderson v. Stewart*, 366 Ark. 203, 234 S.W.3d 295 (2006) (implicitly applying the specific conduct rule to conduct regulated by a state agency).

[57] Nathan Price Chaney, *The Arkansas Deceptive Trade Practices Act: the Arkansas Supreme Court should adopt the specific-conduct rule*, 67 Ark. L. Rev. 299 (2014).

[58] Ark. Const. Art. 2, § 13.

27

diversity of citizenship cases, together with a statutory reasonable attorney's fee, pre-judgment interest, post-judgment interest and statutory twelve (12) percent penalty as provided by Ark. Code Ann. § 23-79-208.

167.   Harness is also entitled to actual damages and attorneys' fees for the deceptive trade practices committed by Liberty Mutual in violation of the ADTPA, in an amount to be determined at trial, in excess of the amount required for federal court jurisdiction in diversity of citizenship cases.

168.   Punitive damages are warranted in this case to punish and deter the intentional conduct and/or conscious indifference of Liberty Mutual in acting in a way that the natural and probable consequences of their actions results in injury to Liberty Mutual's policyholders, including Harness.[59]

169.   Liberty Mutual's conduct toward Harness showed indifference to the health and safety of Harness,[60] who was a financially vulnerable Liberty Mutual policyholder unlikely to be able to defend himself.[61]

170.   In addition to showing a conscious indifference to the health and safety of a financially vulnerable policyholder, Liberty Mutual also intentionally inflicted economic injury to Harness by having a routine business practice of engaging in prohibited conduct under the Trade Practices Act, and thereby violating the ADPTA.

171.   Liberty Mutual's conduct is more than a reasonable effort to control claims costs; it seeks to severely and improperly limit a type of coverage offered to Liberty Mutual policyholders that costs Liberty Mutual money.[62]

---

[59] *Bayer CropScience LP v. Schafer*, 2011 Ark. 518, 21, 385 S.W.3d 822, 835 (2011).

[60] *Arrow Int'l v. Sparks*, 81 Ark. App. 42, 56, 98 S.W.3d 48, 58 (2003).

[61] *BMW of N. Am. v. Gore*, 517 U.S. 559, 576, 116 S. Ct. 1589, 1599, 134 L. Ed. 2d 809, 827 (1996).

28

172.    On information and belief, Liberty Mutual adopted this routine business practice not as a result of lawsuits or regulatory pressure, but to protect money owed to its policyholders in a zero-sum game.

173.    On information and belief, this unlawful and recidivist practice has been ongoing for many years, and is relevant to the reprehensibility of Liberty Mutual's conduct.[63]

## DEMAND FOR JURY TRIAL

174.    Harness demand a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

175.    Harness reserve the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Harness prays that *Summons* be issued for Liberty Mutual, and following a jury trial of this action, Harness be awarded a judgment against Liberty Mutual in in the amount of $1,000,000 for UIM insurance benefits, together with a statutory reasonable attorney's fee, pre-judgment interest, post-judgment interest and statutory twelve (12) percent penalty as provided by Ark. Code Ann. § 23-79-208; as well as actual damages, punitive damages, and attorneys' fees due to Liberty Mutual engaging in prohibited conduct as defined in the Trade Practices Act codified by Ark. Code Ann. § 23-66-101 *et seq.* in violation of the ADTPA; all costs expended by Harness herein; and all other proper relief to which Harness may be entitled in the premises.

---

[62] *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, 31, 376 S.W.3d 414, 433 (2011).

[63] *Jim Ray, Inc. v. Williams*, 99 Ark. App. 315, 322, 260 S.W.3d 307, 311 (2007).

29

Respectfully Submitted,

Don P. Chaney, AR BIN 78027
S. Taylor Chaney, AR BIN 2010011
Chaney Law Firm, P.A.
P.O. Box 1405
Arkadelphia, AR  71923
Email: taylor@chaneylaw.com
Telephone: 870-246-0600
Telefax: 866-734-0971
www.chaneylaw.com

Attorneys for Plaintiff

30